**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

CITY OF PHILADELPHIA,

      Plaintiff,

v.

                                              DEMAND FOR JURY TRIAL

WELLS FARGO & CO., and WELLS FARGO
BANK, N.A.,

      Defendants.

_____/

**<u>COMPLAINT FOR VIOLATIONS OF THE FEDERAL FAIR HOUSING ACT</u>**

# TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION ....................................................................................1

II.     PARTIES ................................................................................................................9

III.    JURISDICTION AND VENUE ...........................................................................11

IV.     WELLS FARGO ENGAGED IN DISCRIMINATORY LENDING PRACTICES ........11

      A.      Wells Fargo Intentionally Discriminated Against Minority Borrowers in Violation of the Fair Housing Act. ......................................................................12

      B.      Wells Fargo's facially neutral business policies and practices created an "artificial, arbitrary, and unnecessary" barrier to fair housing opportunities for minority home purchasers and owners. ....................................14

      D.      Philadelphia's Data Analysis Is Corroborated by Additional Studies/Reports. ....................................................................................................27

      E.      Wells Fargo's Discriminatory Lending Practices Cause Foreclosures. ................30

            1)      Data show that Wells Fargo's foreclosures are disproportionately located in minority neighborhoods in Philadelphia. ................................30

            2)      Data show that Wells Fargo's loans to minorities result in especially quick foreclosures in Philadelphia. ..........................................32

            3)      Data show that the discriminatory lending practices cause the foreclosures in Philadelphia. ......................................................................33

V.      INJURY TO PHILADELPHIA CAUSED BY WELLS FARGO'S DISCRIMINATORY LOAN PRACTICES ........................................................37

      A.      Non-Economic Injuries .........................................................................................38

      B.      Economic Injuries .................................................................................................39

            1)      Philadelphia has been injured by a suppression of property tax revenues from foreclosures caused by Wells Fargo's discriminatory lending practices. .............................................................39

            2)      Philadelphia is injured because it provided and still must provide costly municipal services for foreclosure properties in minority neighborhoods as a direct result of Wells Fargo's discriminatory lending practices. ...................................................................42

i

VI.    SAMPLE PROPERTIES IN THE CITY OF PHILADELPHIA ......................................45

    A.    Foreclosures .........................................................................................................45

    B.    Discriminatory Loans Issued Subsequent to September 23, 2014........................47

VII.   CLAIM FOR RELIEF ....................................................................................................49

DEMAND FOR JURY TRIAL ...................................................................................................52

PRAYER FOR RELIEF ..............................................................................................................52

## I.     NATURE OF THE ACTION

1.      Plaintiff City of Philadelphia ("Philadelphia" or the "City") brings this action against Wells Fargo & Co., Inc. and Wells Fargo Bank, N.A. (hereafter "Wells Fargo" or the "Bank") for the injuries the City has incurred as a result of the Bank's longstanding, unbroken policy and practice of intentionally steering minority borrowers in Philadelphia into "discriminatory" mortgage loans (defined herein as loans that have higher costs and risk features than more favorable and less expensive loans issued to similarly situated white borrowers) and engaging in facially neutral business policies and practices that created an "artificial, arbitrary, and unnecessary" barrier to fair housing opportunities for minority home purchasers and owners. Additionally, Wells Fargo maintained a policy of refusing to extend credit to minority borrowers who desired to refinance the more expensive loans they previously received when such credit was extended to white borrowers.

2.      The conduct the City seeks to remedy is embedded in a larger context, on the one hand, of a history of redlining and reverse redlining in Philadelphia, and also, on the other, of the specific Wells Fargo culture and total breakdown of appropriate internal controls that should prevent and should have prevented not only the discriminatory lending here, but the improper account creation practices now under scrutiny by numerous courts and agencies.

3.      The City brings this suit pursuant to the Fair Housing Act of 1968 ("FHA"), as amended, 42 U.S.C. §§ 3601, *et seq.*, to seek redress for injuries caused by Wells Fargo's[1] pattern

---

[1] Defendants collectively are referred to as "Wells Fargo," including: Wells Fargo & Co., and Wells Fargo Bank, N.A. Plaintiff alleges that Defendants are also liable for residential home loans and lending operations acquired from, and/or sold by or through, AM Mortgage Network DBA Vertice, American Mortgage, American Mortgage Network, American Mortgage Network DBA Vertice, Wachovia Mortgage, Wachovia Mortgage, FSB, World Savings Bank, and World

or practice of illegal and discriminatory mortgage lending. Specifically, Philadelphia seeks injunctive relief and damages for the City's injuries caused by (1) the origination of discriminatory mortgage loans to minority borrowers that are the result of Wells Fargo's unlawful and discriminatory lending practices, and (2) the Bank's subsequent refusal to extend credit to minority borrowers seeking to refinance previously issued discriminatory loans. These illegal practices suppressed property values in minority and low income communities in Philadelphia, reduced the City's property tax revenues, and increased the cost of providing municipal services such as police, fire fighting and code enforcement, as well as the housing counseling and other housing-related services that the City of Philadelphia provides and/or funds.

4.      The unlawful conduct alleged herein consists of both intentional discrimination and disparate impact discrimination. Wells Fargo's policies and practices identified herein were not justified by business necessity or legitimate business interests. There were less costly alternatives available to Wells Fargo that would have achieved the same business goals as were achieved by these policies and practices but would not have yielded the same discriminatory results. For example, Wells Fargo could have charged white borrowers with the same risk profiles as black borrowers the same rates and not violated the law. With respect to disparate treatment, Wells Fargo knowingly repeated and thus ratified the same discriminatory policies year after year, and went further in targeting minority customers.

5.      While Wells Fargo has adapted to changing market conditions necessitated by enhanced public scrutiny of its mortgage lending practices, one issue has remained constant since at least 2004: Wells Fargo has systematically engaged in a continuous and unbroken

---

Savings Bank, FSB, all of which were acquired by Wells Fargo and Co. or Wells Fargo Bank, N.A.

discriminatory pattern and practice of issuing higher cost or more onerous mortgage loans to minority borrowers in Philadelphia when more favorable and less expensive loans were being offered to similarly situated non-minority borrowers. This unlawful pattern and practice continues through the present and has not terminated.

6.      Major banks, including Wells Fargo, have a long history of engaging in redlining[2] throughout Philadelphia. Redlining's historical roots trace to maps produced by the Home Owners' Loan Corporation ("HOLC") in the 1930s that coded city neighborhoods based on racial, ethnic, and economic characteristics. Those maps were adopted by commercial lending institutions and used to determine in which neighborhoods individuals could receive credit. These lending practices resulted in entire neighborhoods and racial and ethnic groups being denied access to credit and homeownership, and contributing to the high rates of poverty and lack of wealth accumulation in these communities.

7.      In the late 1990s, Wells Fargo adapted to changing market conditions and began to flood historically underserved minority communities with mortgage loans that consisted of a variety of high cost and abusive mortgage loan products as compared to the mortgage loans issued to similarly situated white borrowers. This practice of issuing exploitative loan products in minority communities has come to be known as "reverse redlining." Both redlining and reverse redlining have been deemed to violate the FHA by federal courts throughout the country. As former Federal Reserve Chairman Ben Bernanke acknowledged, these twin evils of mortgage discrimination "continue to have particular significance to mortgage markets."[3]

---

[2] Redlining is the practice of denying credit to particular neighborhoods based on race.

[3] Remarks by Federal Reserve Chairman Ben Bernanke at the Operation HOPE Global Financial Dignity Summit, Atlanta, Georgia, *Challenges in Housing and Mortgage Markets*, at 10

8.     Strikingly, although the loans at issue in this lawsuit relate to properties throughout Philadelphia and damage the City as a whole, the majority of the loans are condensed within Philadelphia neighborhoods that are the economic and demographic descendants of the neighborhoods subject to redlining through the Mid-20th Century.  The City has for decades emphasized its desire to give equal, non-discriminatory housing opportunities to all its citizens, its intention to have integrated neighborhoods, and its intolerance of any discrimination in mortgage lending, particularly based on race or national origin.

9.     Expert economic analysis, based on publicly available data, indicates at least 1,067 discriminatory high-cost or high-risk loans issued to minority borrowers by Wells Fargo in Philadelphia between 2004 and 2014 that resulted in foreclosure. These loans are clustered within North, West, and Southwest Philadelphia neighborhoods that have high rates of poverty and significant African American and Hispanic populations. This focus of reverse redlining in neighborhoods that had previously been denied access to credit through redlining and racial discrimination contributed to and accelerated the problems of foreclosed homes and abandoned properties within these neighborhoods.

10.     Wells Fargo's discriminatory lending practices knowingly place vulnerable, underserved borrowers in loans they cannot afford. These practices maximize Wells Fargo's profit without regard to the borrower's best interest, the borrower's ability to repay, the financial health of underserved minority neighborhoods like Olney and Southwest Philadelphia, or the costs and injuries to the City of Philadelphia. Moreover, Wells Fargo has averted any significant

---

(Nov. 15, 2012), *available at* www.federalreserve.gov/newsevents/speech/bernanke 20121115a.htm.

risk to itself by selling the vast majority of mortgage loans it originates or purchases on the secondary market.

11.     Wells Fargo's discriminatory misconduct has also caused an excessive and disproportionately high number of foreclosures, particularly in minority and low-income neighborhoods in Philadelphia. These foreclosures often occur when a minority borrower who previously received a discriminatory loan sought to refinance the loan, only to discover that Wells Fargo refused to extend credit at all, or only would refinance on less favorable terms as the Bank would offer to refinance similar loans issued to white borrowers. The inevitable and direct consequence of the combination of issuing unnecessarily expensive or inappropriate loans, and then refusing to refinance the loans, was foreclosure.

12.     These discriminatory patterns and practices have caused an excessive and disproportionately high number of foreclosures on the loans it has made to minorities in the City of Philadelphia. In particular, as a result of these patterns and practices, foreclosures on loans originated by Wells Fargo are concentrated in neighborhoods with higher proportions of minorities. Indeed, *a loan in a predominantly minority neighborhood is **4.710 times more likely to result in foreclosure** than is a loan in a predominantly white neighborhood.* This foreclosure rate amplifies the effect of Wells Fargo's high risk loans already being focused in minority neighborhoods.

13.     Wells Fargo would have had comparable foreclosure rates in minority and white neighborhoods if it was properly and uniformly applying responsible underwriting practices. Wells Fargo possesses sophisticated underwriting technology, analytic tools, data, and access to reports that allow it to predict with precision the likelihood that it had improperly issued a more expensive loan, as well as the likelihood the loan would result in delinquency, default, or

foreclosure.[4] And if that was not sufficient, the Bank had branch offices located in Philadelphia and knew, or should have known, of the adverse consequences of its lending misconduct to minority borrowers and the City regardless of whether the Bank subsequently sold the loan or servicing rights to a third party. Consequently, the Bank's improper issuance of more expensive loans to minority borrowers and the resulting injuries suffered by the City were not the result of random events.

14.     The data on Wells Fargo loans in the City of Philadelphia reveals a widespread pattern or practice of discrimination. For example, a regression analysis that *controls for credit history* and other factors demonstrates that African-American Wells Fargo borrowers were 2.102 times more likely to receive a high-cost or high-risk loan[5] than a white borrower. Latino borrowers were 1.655 times more likely to receive a high-cost or high-risk loan than comparable white borrowers. The regression analysis confirms that African-Americans with FICO scores over 660 are 2.570 times more likely to receive a high-cost or high-risk loan from Wells Fargo as a white borrower, and a Latino borrower 2.073 times more likely.

15.     This is not the first challenge to Wells Fargo's discriminatory lending practices. To date, successful discriminatory lending actions alleging conduct similar to that alleged herein have been brought against Wells Fargo by the City of Baltimore, the City of Memphis, the Department of Justice, and the Federal Reserve Bank. The Federal Reserve levied an $85 million

---

[4] The scope of Wells Fargo's risk analysis policies and practices is set forth in detail throughout the Bank's 2015 Annual Report, *available at* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2015-annual-report.pdf.

[5] As used here, "high-cost or high-risk loans" are loans with one or more of the following characteristics or types: loans that are rate-spread reportable under the Home Mortgage Disclosure Act, subprime loans, negative amortization loans, "No-Doc" loans, balloon payments, and/or "interest only" or teaser loans that also carry a prepayment penalty.

penalty against Wells Fargo, representing the largest penalty it has assessed in a consumer protection enforcement action.

16.     The Department of Justice's Civil Rights Division determined that mortgage brokers who generated loan applications through Wells Fargo's wholesale channel, and were granted broad pricing discretion by Wells Fargo, had charged higher fees and rates to tens of thousands of minority borrowers across the country than they had to white borrowers who posed the same credit risk—selling what Wells Fargo employees in Baltimore referred to as "ghetto loans."

17.     According to former Federal Reserve Chairman Bernanke, "foreclosures can inflict economic damage beyond the personal suffering and dislocation that accompany them. Foreclosed properties that sit vacant for months (or years) often deteriorate from neglect, adversely affecting not only the value of the individual property but the values of nearby homes as well. Concentrations of foreclosures have been shown to do serious damage to neighborhoods and communities, reducing tax bases and leading to increased vandalism and crime. Thus, the overall effect of the foreclosure wave, especially when concentrated in lower-income and minority areas, is broader than its effects on individual homeowners."[6]

18.     The discriminatory lending patterns and practices at issue herein have resulted in what many leading commentators describe as the "greatest loss of wealth for people of color in modern US history." It is well established that poverty and unemployment rates for minorities exceed those of whites, and therefore, home equity represents a disproportionately high

---

[6] Bernanke, *supra* note 3.

percentage of the overall wealth for minorities.[7] As Chairman Bernanke explained, as a result of the housing crisis, "most or all of the hard-won gains in homeownership made by low-income and minority communities in the past 15 years or so have been reversed."[8] The resulting impact of these practices represents "nothing short of the preeminent civil rights issue of our time, erasing, as it has, a generation of hard fought wealth accumulation among African-Americans."[9]

19.     In addition to causing injuries to minority borrowers who received these discriminatory loans, Wells Fargo's discriminatory pattern and practices at issue here have caused numerous injuries to the City of Philadelphia, including, without limitation: (a) suppressed property tax revenues resulting from suppressed property values of both the foreclosed properties and those properties in close proximity to the foreclosed properties; (b) the cost of increased municipal services for these properties, many of which are incurred even before foreclosure; and (c) harm to the non-economic interests of the City, which promotes fair non-discriminatory housing opportunities to its citizens and seeks the benefits of an integrated community.

20.     The widespread economic and non-economic injuries throughout the City caused by the Bank's discriminatory mortgage lending policies and practices were known, recklessly ignored, or knowable to the Bank through a variety of analytical tools and published reports available to the Bank had it not turned a blind eye.  Thus, the City is entitled to recover the injuries that are directly attributable to the Bank's conduct.

---

[7] Robert Schwemm & Jeffrey Taren, *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act*, 45 Harv. C.R.-C.L. L. Rev. 375, 382 (2010).

[8] Bernanke, *supra* note 3.

[9] Charles Nier III & Maureen St. Cyr, *A Racial Financial Crisis: Rethinking the Theory of Reverse Redlining to Combat Predatory Lending Under the Fair Housing Act*, 83 Temple L. Rev. 941, 942 (2011).

21.     This suit seeks to recoup the damages sustained by the City as a result of Wells Fargo's discriminatory pattern and practices in mortgage lending and enjoin the continuation of these discriminatory pattern and practices.  Wells Fargo is, unfortunately, a recidivist corporate actor, and, just as it is being held accountable for its blatant and shocking unauthorized account creation scheme that is currently and recently in the news, so too should it be accountable for this functionally similar approach to profits over compliance, in this case, at the expense of minorities– and at great cost to the City.

## II.     PARTIES

22.     Plaintiff City of Philadelphia is the largest city in the Commonwealth of Pennsylvania. The City has maintained an active and longstanding interest in the quality of life and the professional opportunities that attend an integrated community. One way that the City has furthered these interests is through the Philadelphia Commission on Human Relations ("PCHR"), which is charged with responsibility for Philadelphia's Fair Practices Ordinance that includes provisions prohibiting discrimination in housing, including prohibiting discrimination by lenders on the basis of race and ethnicity. The PCHR seeks to reduce illegal housing discrimination by investigating fair housing complaints, adjudicating them if necessary, and by conducting educational programs.  The City also maintains programs that seek to benefit low to moderate income residents, encourage home repair and rehabilitation, prevent mortgage foreclosures, and reduce blight and prevent homelessness throughout the City.

23.     Defendant Wells Fargo & Company is a nationwide, diversified financial services company. Upon information and belief, Wells Fargo & Company is a publicly traded Delaware corporation and its corporate headquarters are located in San Francisco, California. It is the parent

company of Wells Fargo Bank, N.A., and is the ultimate parent in the Wells Fargo organizational structure.

24.     Defendant Wells Fargo Bank, N.A. is a national banking association chartered in South Dakota with its principal place of business in San Francisco, California. It maintains multiple offices in the Commonwealth of Pennsylvania and in the City of Philadelphia for the purposes of soliciting applications for and making residential mortgage loans and engaging in other business activities.

25.     The Defendants in this action are, or were at all relevant times, subject to Federal laws governing fair lending, including the FHA, and the regulations promulgated under each of those laws. The FHA prohibits financial institutions from discriminating on the basis of, *inter alia*, race, color, or national origin in their residential real estate-related lending transactions.

26.     The Defendants in this action are or were businesses that engage in residential real estate-related transactions in the City of Philadelphia within the meaning of the FHA, 42 U.S.C. § 3605.

27.     Defendants acquired residential home loans sold by or through Wells Fargo Financial, Wells Fargo Funding, Inc., Wachovia Mortgage, FSB, Wachovia Bank, N.A., Wachovia Mortgage Co., World Savings Bank, FSB, American Mortgage Network, Inc., and Home Services Lending, LLC. Through these loan acquisition agreements and arrangements, Defendants acquired the liabilities associated with these loans, including, without limitation, liabilities for violations of the FHA, from Wells Fargo Financial, Wells Fargo Funding, Inc., Wachovia Mortgage, FSB, Wachovia Bank, N.A., Wachovia Mortgage Co., World Savings Bank, FSB, American Mortgage Network, Inc., and Home Services Lending, LLC.

10

28.     Upon information and belief, Plaintiff alleges that each of the Defendants was and is an agent of the other Defendants.  Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting in the course and scope of its actual or apparent authority pursuant to such agencies, and/or the alleged acts or omissions of each Defendant as agent were subsequently ratified and adopted by each agent as principal. Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting through its agents, and is liable on the basis of the acts and omissions of its agents.

## III.     JURISDICTION AND VENUE

29.     This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1331, 1343, because the claims alleged herein arise under the laws of the United States.

30.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Wells Fargo conducts business in this District and a substantial part of the events and omissions giving rise to the claims occurred in this District.

## IV.     WELLS FARGO ENGAGED IN DISCRIMINATORY LENDING PRACTICES

31.     Wells Fargo engaged in both intentional discriminatory business practices and neutral business practices that created "artificial, arbitrary and unnecessary" barriers to fair housing opportunities for minority home purchasers and owners. Confidential Witnesses ("CWs") confirm the existence of these practices. The CWs are former Wells Fargo employees responsible for making and/or underwriting loans on behalf of Wells Fargo in Philadelphia, and each had clients in Philadelphia. CW1 worked for Wells Fargo in Philadelphia as a Home Mortgage Consultant between 2008-2015. CW2 worked for Wells Fargo in Philadelphia as a Home Mortgage Consultant between 2005-2013. CW3 worked for Wells Fargo in Philadelphia as a Home Mortgage Consultant between 2009-2014. CW4 worked for Wells Fargo in Philadelphia

as a Home Mortgage Consultant between 2010-2011. CW5 worked for Wells Fargo in the Philadelphia metropolitan area as a Home Mortgage Consultant between 2001-2011 and had clients who resided within the City. CW6 worked as a Home Mortgage Consultant for Wells Fargo between 2015-2016 and had clients who resided within the City.

### A. Wells Fargo Intentionally Discriminated Against Minority Borrowers in Violation of the Fair Housing Act.

32.     Wells Fargo's employees intentionally steered minority borrowers into high cost loans because of their race.

33.     Wells Fargo's loan officers and mortgage consultants used race as a factor in determining which loan products to offer borrowers, what interest rates to charge, and whether to use certain devices and options such as "lender credits."

34.     CW2 explained that minority borrowers tended to receive more expensive loans than white borrowers because (1) Wells Fargo did not tell them about all possible loan options, (2) they were unaware cheaper alternative options existed, or (3) they did not ask more in-depth questions regarding loan options because they were not as savvy about mortgage loans as white borrowers. In other words, Wells Fargo specifically took advantage of minority borrowers to maximize profits.

35.     In selling minority borrowers more expensive loans, Wells Fargo loan officers and mortgage consultants associated and pushed various higher-cost loan products and options with minority borrowers. For example, CWs explained that FHA loans were more expensive than conventional loans. Indeed, CW3 went so far as to say that she associates FHA loans processed in Philadelphia with minority borrowers.

36.     Wells Fargo's loan officers also targeted minority borrowers to sell them "lender credits." CW1 explained that Wells Fargo generated profits through the use of lender credits and

was aware that minority, as opposed to white, borrowers were receptive to these types of higher rate loan products. Lender credit loans involve the Bank paying the borrower's closing costs in exchange for receiving a loan with a higher interest rate. Over time, the borrower pays back the credits by making higher monthly payments. After a certain point, referred to as the "pay back" period, the borrower is no longer repaying the lender credits, but instead is making payments on a higher interest rate loan that generates additional revenue for the Bank with no additional benefits for the borrower. According to CW6, Wells Fargo's loan pricing computer software "flagged" loans as high cost when closing costs exceeded a percentage of the loan value, which occurred more frequently in connection with lower dollar value loans that Wells Fargo targeted to minority borrowers. When the amount of loan closing costs exceeded the allowable amount, Wells Fargo could either absorb a portion of these costs, which reduced the Bank's profit on the loan, or it could offer a borrower lender credits in exchange for a higher cost loan in order to complete the loan transaction. Maximizing profits to the detriment of minority borrowers is fully consistent with CW2's explanation that the Bank took advantage of minorities and issued more expensive loans to these borrowers than white borrowers. CW1 further explained that Wells Fargo would not provide borrowers with information regarding the "pay back" period, which would have enabled them to understand the consequences of receiving a loan with lender credits. This testimony is consistent with that of CW2, who stated that minority borrowers received less information concerning loan products than white borrowers. CW4 explained that many of the Bank's minority borrowers paid higher interest rates than white borrowers because they received loans with lender credits, particularly refinance loans.

37.     As discussed below, Wells Fargo's neutral policies enabled and incentivized loan officers to make loan pricing decisions based on the borrower's race. The results were that loan

13

officers used race as a factor in intentionally steering borrowers into more expensive and riskier loan products.

38.     The referenced CW statements establish that Wells Fargo marketed high cost loans (including, but not limited to, FHA loans and loans with lender credits) in minority neighborhoods, failed to provide minority borrowers with all pertinent loan information, and did so due to Wells Fargo's belief that minority borrowers would be less likely to recognize the unfair terms of the offered loans due to a perceived lack of sophistication.  In so doing, Wells Fargo treated minority borrowers differently than white borrowers while seeking to maximize profits.

39.     Upon information and belief, the practices and problems described by these confidential witnesses are consistent with those perpetrated by Wells Fargo throughout the country and have continued into the present.

**B.      Wells Fargo's facially neutral business policies and practices created an "artificial, arbitrary, and unnecessary" barrier to fair housing opportunities for minority home purchasers and owners.**

40.     Wells Fargo engaged in numerous facially neutral lending practices that resulted in the disparate impact reflected in the statistical analyses set forth in this complaint during the time periods at issue herein.  These practices are united because they represent manifestations of the same continuous and unbroken practice of engaging in facially neutral business policies and practices that created an "artificial, arbitrary, and unnecessary" barrier to fair housing opportunities for minority home purchasers and owners.  A partial list of these practices includes, but is not limited to, the following:

> a.   providing loan officers discretion to place borrowers in more expensive and riskier loans than the borrowers qualified for;
>
> b.   providing loan officers discretion to sell lender credits without disclosing the true effect of the pricing of those credits;

14

    c.  marketing certain more expensive or riskier loan products to residents in predominantly minority neighborhoods;

    d.  utilizing a compensation scheme that incentivized loan officers to sell more expensive and riskier loans than borrowers qualified for;

    e.  requiring substantial prepayment penalties that prevent borrowers whose credit has improved from refinancing their discriminatory loan to a prime loan;

    f.  charging excessive points and fees that are not associated with any increased benefits for the borrower; and

    g.  providing loan officers with information about loan pricing that is higher than the lowest price Wells Fargo could offer the borrower.

41.    The CW statements make clear that these practices contributed to the adverse borrowing terms experienced by minority borrowers.

42.    The CW statements provided numerous ways that loan officers were afforded discretion to place a borrower in a more expensive loan than the borrower qualified for and how that discretion resulted in discriminatory effects. CW2 explained that Wells Fargo's compensation structure incentivized loan officers to offer more expensive loans with lender credits to minorities.

43.    Similarly, loan officers used their discretion to sell more expensive FHA loans to minority borrowers who otherwise qualified for conventional loans. According to CW3, FHA loans were more expensive than traditional loans and she associates FHA loans processed in Philadelphia with minority borrowers.

44.    Wells Fargo also facilitated the selling of more expensive loans. CW4 explained that Wells Fargo entered a borrower's financial information into the Bank's loan pricing software system. The program calculated a price for the loan, but also provided a range of prices for which the loan officer had discretion to charge the borrower.

45.     In addition to providing discretion to issue different, more expensive loan products and providing other pricing discretion, loan officers were afforded discretion to sell "lender credits" to borrowers.

46.     As noted above, CW1 explained that Wells Fargo generated profits through the use of lender credits.  According to CW1, Wells Fargo did not provide borrowers with information regarding the pay back time period because the Bank deemed it proprietary information.

47.     CW4 explained that many of the Bank's minority borrowers paid higher interest rates than white borrowers because they received loans with lender credits, particularly refinance loans.

48.     CW5 said that FHA loans often required closing costs that exceeded the relatively low down payment required for this type of loan.  Borrowers unable to pay the closing costs therefore needed to obtain lender credits, and as the witness explained, it would require a significant increase in the interest rate to receive enough lender credits to cover $4,000 to $5,000 in closing costs.

49.     Together, these practices have symbiotic effects. Loan officers are afforded discretion to sell higher-priced loan products. Loan officers frequently use race and educational background as proxies for their ability to sell more expensive loan products.  These more expensive loan products often have closing costs, which exceed the down payment, leading to the sale of lender credits to the borrowers.  And as a result, borrowers residing in minority neighborhoods with lower home values and less ability to pay closing costs therefore received more loans with higher interest rates than white borrowers who did not require lender credits to pay closing costs.  The high cost effect of the lender credits throughout the life of the loan was not explained or disclosed.

16

50.     Furthermore, Wells Fargo uses financial incentives to encourage loan officers to use their discretion to sell more expensive and riskier loans. Indeed, loan officers were financially incentivized to sell more expensive loans.  CW3 said that loan officers were provided with financial incentives by Wells Fargo if they issued loans to borrowers at higher rates than the borrowers were actually qualified to receive.  Not coincidentally, CW3 noted that loan officers received higher commissions from the sale of an FHA loan as compared to a conventional loan.

51.     The effect of these financial incentives was to encourage the issuance of discriminatory loans to minority borrowers.

52.     In addition to these policies and practices, Wells Fargo's omissions and failures to act and institute adequate policies to combat against the discriminatory effects of its conduct make Wells Fargo further culpable for the discriminatory effects of its conduct.  These omissions and failures to act include, without limitation:

    a.  knowing about lending practices that either created high risk and higher cost loans to minorities compared to comparably credit situated white borrowers or failing to adequately monitor the Bank's practices regarding mortgage loans, including but not limited to originations, marketing, sales, and risk management;

    b.  failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history;

    c.  failing to prudently underwrite hybrid adjustable-rate mortgages ("ARMs"), such as 2/28s and 3/27s;[10]

    d.  failing to prudently underwrite refinance loans, where borrowers substitute unaffordable mortgage loans for

---

[10] In a 2/28 ARM, the "2" represents the number of years the mortgage will be fixed over the term of the loan, while the "28" represents the number of years the interest rate paid on the mortgage will be variable. Similarly, in a 3/27 ARM, the interest rate is fixed for three years and variable for the remaining 27-year amortization.

17

existing mortgages that they are well-suited for and that allow them to build equity;

e.  failing to monitor and implement necessary procedures within Wells Fargo's Internal Audit, Corporate Risk, Human Resources, Law Department, and Board of Directors throughout the Community Banking segment, which includes Wells Fargo's retail mortgage banking business responsible for the unlawful activities set forth herein, to ensure compliance with federal fair lending laws;

f.  failing to abide by the terms of Wells Fargo's Vision & Values, which purportedly guides Defendants' business practices and relationships with customers; and

g.  failing to ensure that Wells Fargo's decentralized organizational structure was capable of properly monitoring mortgage lending activities within Community Banking.

53.     As discussed herein, the actual and foreseeable effect of these neutral business practices and omissions and failures to act has created a statistically significant adverse effect on minority borrowers.

54.     Wells Fargo's discriminatory lending practices stem from pervasive and long-running problems, including the company's corporate culture, which emphasized sales and revenues first and foremost, compensation structure, and failure of internal controls and other pertinent compliance procedures.  Wells Fargo itself has acknowledged these problems.

55.     For example, when consenting to the Federal Reserve's $85 million penalty in 2011, Wells Fargo acknowledged that its flawed culture, employment practices, and internal controls contributed to widespread illegal lending practices.   Specifically, Wells Fargo acknowledged that its employees "were expected to sell (a) a minimum dollar amount of loans to avoid performance improvement plans that could result in loss of their positions . . . and (b) a minimum dollar amount of loans to receive incentive compensation payments" and that many employees, "in order to meet sales performance standards and receive incentive compensation,

altered or falsified income documents and inflated prospective borrowers' incomes to qualify those borrowers for loans that they would not otherwise have been qualified to receive." As Wells Fargo admitted, this misconduct occurred because Wells Fargo's "internal controls were not adequate."

56.     The very next year, in 2012, Wells Fargo agreed to pay $175 million to resolve claims by the United States Department of Justice that between 2004 and 2009, Wells Fargo Bank, N.A. engaged in a pattern or practice of discrimination on the basis of race and national origin in residential mortgage lending in violation of the Equal Credit Opportunity Act and the Fair Housing Act. The Department of Justice began its investigation into Wells Fargo's lending practices in 2009 and received a referral in 2010 from the Office of the Comptroller of the Currency (OCC), which conducted its own parallel investigation of Wells Fargo's lending practices in the Baltimore and Washington, D.C. metropolitan areas. The OCC found that there was reason to believe that Wells Fargo engaged in a pattern or practice of discrimination in certain metro areas including Philadelphia on the basis of race or color. The $175 million settlement was the second largest fair lending settlement in the history of the Department of Justice.

57.     Last year, in 2016, Wells Fargo agreed to pay $1.2 billion to settle additional civil mortgage fraud claims brought by the Department of Justice. In the settlement, Wells Fargo admitted, acknowledged and accepted responsibility for, among other things, certifying to the Department of Housing and Urban Development, during the period from May 2001 through December 2008, that certain residential home mortgage loans were eligible for government insurance when in fact they were not, resulting in the Government having to pay insurance claims when some of those loans defaulted. The $1.2 billion settlement with Wells Fargo was the largest recovery for loan origination violations in the Federal Housing Authority's history.

58.     Wells Fargo's Community Banking operating segment, which includes the retail mortgage banking business responsible for the unlawful lending activities at issue herein, is by far the most profitable of Defendants' three operating business segments.  For example, in 2015, Community Banking reported net income of $13.5 billion, representing 59% percent of Defendants' total 2015 net income of $22.9 billion.[11]  In 2014, Community Banking reported net income of $14.2 billion, representing 61% of Defendants' total 2014 net income of $23.1 billion.[12]  In 2013, Community Banking reported net income of $12.7 billion, representing 58% of Defendants' total 2013 net income of $21.9 billion.[13]  In 2012, Community Banking reported net income of $10.5 billion, representing 56% of Defendants' total 2012 net income of $18.9 billion.[14]  In 2011, Community Banking reported net income of $9.1 billion, representing 57% percent of Defendants' total 2011 net income of $15.9 billion.[15]  Defendants' unlawful mortgage lending conduct at issue herein was an important component of Community Banking's financial success and Wells Fargo's bottom line profitability.

59.     At all times pertinent to this action, Wells Fargo was guided by its widely criticized philosophy of cross-selling eight products to each customer, commonly referred to as the "Gr-

---

[11] https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2015-annual-report.pdf at 30, 48.

[12] https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2014-annual-report.pdf at 34, 46.

[13] https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2013-annual-report.pdf at 34, 44.

[14] https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2012-annual-report.pdf at 34, 44.

[15] https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2011-annual-report.pdf at 30, 40.

Eight."  Within Community Banking, "the cross-sell metric represents the relationship of all retail products used by customers in retail banking households."[16]  This practice has resulted in the commencement of actions by numerous government entities, including hearings before committees of both the United States Senate and House of Representatives in the fall of 2016. Mortgage loans represent one of these retail products.

60.     Systematic problems with Wells Fargo's culture, employment practices, and internal controls persist to this day.  As Wells Fargo's independent directors acknowledged in their Sales Practices Investigation Report dated April 10, 2017 ("Board Report")[17] after reviewing the root causes of pervasive fraud by Wells Fargo's Community Banking segment, employees frequently engaged in wrongdoing "to achieve sales goals and incentive compensation targets." According to the directors, many Wells Fargo employees have stated "that incentive compensation plans overly emphasized sales performance, and many complained to Community Banking leadership that incentive plan goals were too high, too focused on sales and led to bad behavior."   The directors acknowledged: "The root cause of sales practice failures was the distortion of Community Banking's sales culture and performance management system, which, when combined with aggressive sales management, created pressure on employees to sell unwanted or unneeded products to customers and, in some cases, to open unauthorized accounts. Wells Fargo's decentralized corporate structure gave too much autonomy to Community Banking's senior leadership, who were unwilling to change the sales model or even recognize it as the cause of the problem."

---

[16] *See, e.g.*, Wells Fargo & Co. Annual Report 2015, *supra* note 11, at 46.

[17] https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/presentations/2017/board-report.pdf.

61.     In addition to the decentralized operational structure and fragmentation of control functions, the Board Report provided specific details concerning the multiplicity of failures that occurred within Community Banking, including, but not limited to, the following:

- the Audit Department had access to information regarding sales practices but did not view its role as encompassing more broadly the root cause of the improper sales conduct;

- even as late as 2015 when sales practices were labeled high risk, there was a general perception within the bank's control functions that the sales practice problems were of relatively modest significance;

- the Board failed to receive information concerning the magnitude of the problems in a timely manner and the board's actions failed in several respects— (1) the bank should have centralized the risk functions at an earlier date; (2) the Risk Committee and Board should have insisted on a more detailed and concrete action plan to track sales practice abuses, which was not implemented until this year; and (3) the Board should have been more forceful in pushing its Chief Executive Officer, John Stumpf, to change leadership within Community Banking;

- control functions outside of Community Banking, including the Board, could not adequately assess the sales practice issues because Carrie Tolstedt (who has since been fired) reinforced a culture of tight control over information concerning Community Banking;

- Claudia Russ Anderson led the first line of defense for risk at Community Banking and her performance fell far short of what was expected/required from a senior risk officer.  She failed to adequately assess and advocate for changes in the business practices that resulted in the sales integrity violations; she ran interference for Tolstedt and filtered communications with other Wells control officers; she was too slow to address sales practice issues;

- there was a growing conflict over time between Wells Fargo's Vision and Values and Community Banking's emphasis on sales goals;

- even when challenged by their regional leaders, the senior leadership of Community Banking failed to appreciate or accept that their sales goals were too high and becoming increasingly untenable;

- the Community Banking identified itself as a sales organization, like a department or retail store, rather than a service-oriented financial institution;

- in February 2017, the Board announced the termination for cause of four officers within Community Banking, including the Group Risk Officer and the

Head of Strategic Planning and Finance, who bore primary responsibility for overseeing the sales goals and incentive system;

- while sales practices at Community Banking became more apparent between 2013-2015, Corporate Risk was still a work in progress and the Chief Risk Officer had limited authority with respect to Community Banking;

- the legal department, particularly at the senior levels, failed to discuss or appreciate the seriousness and scale of the sales practice issues within Community Banking or fully consider whether there might be a pattern of illegal conduct involved; and

- sales practice concerns have been raised with regard to Community Banking's online insurance referral program.

62.     On April 19, 2017, the Office of the Comptroller of the Currency issued a report titled "Lessons learned review of supervision of sales practices at Wells Fargo."[18]  The OCC Report noted numerous compliance related problems at Wells Fargo, including, among others the following:

- issues concerning sales practices were identified in the bank's audit committee reports as early as 2005;

- since 2005 the Board received regular Audit & Security reports indicating the highest level of EthicsLine internal complaint cases and employee terminations were related to sales integrity violations; and

- in 2006 Wells Fargo's #2 strategic objective was "Going for Gr-Eight," which promoted doubling the number of products per customer to eight.

63.     Significantly, the systemic problems within Wells Fargo that enabled the unlawful sales practices to flourish regarding the unlawful opening of bank accounts and credit cards also enabled Wells Fargo to engage in the long-standing pattern and practice of unlawful mortgage lending at issue herein.  That point was made in a recent speech given by William Dudley, President of the Federal Reserve Bank of New York, referencing both the Wells Fargo new

---

[18] https://www.occ.gov/publications/publications-by-type/other-publications-reports/pub-wells-fargo-supervision-lessons-learned-41917.pdf.

account scandal and sales practices in the mortgage banking industry.  According to President Dudley,

> Wells Fargo's chairman and CEO resigned after regulators uncovered what appeared to be widespread fraud in the retail bank.  Compensation, once again, seems to be at the center of a scandal.  Neighborhood bankers were paid based on the volume of new accounts opened, apparently with utter disregard for whether customers wanted them or even knew about them.  And, like mortgage brokers in the early 2000s, it appears that job security depended almost exclusively on meeting targets, regardless of how those targets were met.  There was a serious mismatch between the values Wells Fargo espoused and the incentives that Wells Fargo employed.[19]

Thus, the compensation structure incentivized Wells Fargo employees in Community Banking and in other retail operations to evade internal controls and produce discriminatory, high cost loans to minorities, because such lending increased employee compensation and Wells Fargo's revenues.

64.    Further evidence of multiple control failures within Wells Fargo directly impacting the mortgage business is reflected by the fact that for an extended period of time dating back to at least 2004, Wells Fargo has engaged in a continuous pattern and practice of issuing unlawful mortgages to minority borrowers throughout the country, as opposed to within a small and isolated geographic region.  Both the scope and breadth of Defendants' unlawful lending conduct is consistent with extensive control failures.

65.    There is no legitimate business purpose for these policies and practices as non-discriminatory policies and practices could achieve any legitimate benefits inuring therefrom.

---

[19] *See* https://www.newyorkfed.org/newsevents/speeches/2017/dud170321#footnote8.

66.     Upon information and belief, the practices and problems described herein, including those described by the confidential witnesses, are consistent with those perpetrated by Wells Fargo throughout the country and have continued into the present.

**C.     Minorities in Philadelphia Receive Discriminatory Loan Terms from Wells Fargo Regardless of Creditworthiness.**

67.     As discussed herein, a non-exhaustive list of the types of loans that Wells Fargo issued to minorities when they otherwise qualified for less expensive and less risky loans include the following: rate-spread reportable and high-cost loans (*i.e.*, loans with an interest rate that was at least 3% above the Treasury rate prior to 2010 and 1.5% above the prime mortgage rate thereafter),[20] subprime loans, interest-only loans, balloon payment loans, loans with prepayment penalties, negative amortization loans, no documentation loans, higher cost government loans, including FHA[21] and VA[22] loans and HELOC's, and/or ARM loans with teaser rates (*i.e.*, lifetime maximum rate greater than initial rate + 6%).

68.     Data reported by the Bank and available through both public and private databases shows that minorities in Philadelphia received unfavorable loan terms from Wells Fargo more frequently than white borrowers regardless of creditworthiness.

69.     A regression analysis of this data controlling for borrower race and objective risk characteristics such as credit history, loan-to-value ratio, and the ratio of loan amount to income

---

[20] This definition applies to first lien loans.

[21] FHA loans are insured by the Federal Housing Administration and require borrowers to pay for mortgage insurance and may entail other costs. People with credit scores under 500 generally are ineligible for FHA loans.

[22] VA loans are guaranteed by the U.S. Department of Veterans Affairs, available to veterans or surviving spouses who do not remarry, and generally do not require a down payment on the property.

demonstrates that, from 2004 to 2014, an African-American borrower was 2.102 times more likely to receive a high-cost or high-risk loan as a white borrower possessing similar underwriting and borrower characteristics.[23]  The regression analysis further demonstrates that the odds that a Latino borrower would receive a high-cost or high-risk loan were 1.655 times the odds that a white borrower possessing similar underwriting and borrower characteristics would receive a high-cost or high-risk loan.  These odds ratios demonstrate a pattern of statistically significant differences between the loans issued to African-American and Latino borrowers as compared to similarly situated white borrowers.[24]

70.     The regression analysis also shows that these disparities persist when comparing only borrowers with FICO scores above 660.  An African-American borrower with a FICO score above 660 was 2.570 times more likely to be issued a high-cost or high-risk loan as a white borrower with similar underwriting and borrower characteristics.  A Latino borrower with a FICO score above 660 was 2.073 times more likely to receive a high-cost or high-risk loan as a white borrower with similar underwriting and borrower characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between the loans issued to African-American and Latino borrowers as compared to similarly situated white borrowers.

71.     A similar regression analysis taking into account the racial makeup of the borrower's neighborhood rather than the individual borrower's race shows that borrowers in heavily minority neighborhoods in Philadelphia were more likely to receive a high-cost or high-

---

[23] As alleged throughout the Complaint, all references to the date range 2004-2014 are intended to include the time period up to and including December 31, 2014.

[24] Statistical significance is a measure of probability that an observed outcome would not have occurred by chance.  As used in this Complaint, an outcome is statistically significant if the probability that it could have occurred by chance is less than 5%.

risk loan than borrowers in heavily white neighborhoods.  For example, a borrower in a minority census tract (census tract consisting of at least 50% African-American or Latino households) was 2.438 times more likely as a borrower with similar characteristics in a non-minority neighborhood (census tract with at least 50% white households) to receive a high-cost or high-risk loan.  These odds ratios demonstrate a pattern of statistically significant differences between the loans issued to African-American and Latino borrowers as compared to similarly situated white borrowers.

72.     Additionally, data reported by the Bank and available through public databases shows that in 2004-2014, 23.3% of loans made by Wells Fargo to African-American and Latino customers in Philadelphia were high-cost or high-risk loans, but only 7.6% of loans made to white customers in Philadelphia were high-cost or high-risk loans.  This data demonstrates a pattern of statistically significant differences in the product placement for high-cost or high-risk loans between minority and white borrowers.

73.     Thus, the disparities in Philadelphia are not the result of, or otherwise explained by, legitimate non-racial underwriting criteria.

74.     The fact that loans issued pursuant to Wells Fargo's discriminatory lending practices are more heavily concentrated in minority neighborhoods in Philadelphia has, based upon information and belief, contributed directly to the disproportionately high rates of foreclosure in the City's minority communities.

D.     **Philadelphia's Data Analysis Is Corroborated by Additional Studies/Reports.**

75.     According to *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act*, 45 Harv. C.R.-C.L. L. Rev. 375, 398 (2010), several studies dating back to 2000 have established that minority borrowers have been charged higher interest rates/fees than similar creditworthy white borrowers.

27

76.     Likewise, according to *A Racial Financial Crisis*, 83 Temple Law Rev. 941, 947, 949 (2011), one study concluded that "even after controlling for underwriting variables, African-American borrowers were 6.1% to 34.3% more likely than whites to receive a higher rate subprime mortgage during the subprime boom."  And another study found that significant loan pricing disparity exists among low risk borrowers—African-American borrowers were 65% more likely to receive a subprime home purchase loan than similar creditworthy white borrowers, and 124% more likely to receive a subprime refinance loan.

77.     Similarly, the Center for Responsible Lending's November 2011 report, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures*, stated that "racial and ethnic differences in foreclosure rates persist even after accounting for differences in borrower incomes."  Further, the Center stated it is "particularly troublesome" that minorities received riskier loans "even within [similar] credit ranges."  For example, among borrowers having FICO scores above 660, the incidence of higher rate loans among various groups was as follows: whites–6.2%; African-American–21.4%; and Latino–19.3%.[25]

78.     The Philadelphia rate-spread reportable or "high cost" analysis is similar to national trends as confirmed by an analysis of the national HMDA data for the period 2012-2014. According to a report prepared by the Center for Responsible Lending, "[t]he percentage of African-Americans with high cost loans rose from 5.3% in 2012 to 14.2% in 2013 to 25.5% in

---

[25] Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures*, at 5, 21 (Nov. 2011), *available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/Lost-Ground-2011.pdf.

2014.  Similarly, the rate rose from 5.9% in 2012 to 16.8% in 2013 to 28.3% in 2014 for Latino borrowers."[26]

79.     In general, as recently observed by the Federal Reserve in December 2012, both African-American and Latino borrowers were far more likely (in fact, nearly twice more likely) to obtain higher-priced loans than were white borrowers.  These relationships hold both for home-purchase and refinance lending and for non-conventional loans.  These differences are reduced, but not eliminated, after controlling for lender and borrower characteristics.  "Over the years, analyses of HMDA data have consistently found substantial differences in the incidence of higher-priced lending across racial and ethnic lines, differences that cannot be fully explained by factors included in the HMDA data."[27]

80.     African-Americans and Latinos were much more likely to receive high-cost or high-risk loans with features that are associated with higher foreclosures, specifically prepayment penalties and hybrid or option ARMs.  These disparities were evident even comparing borrowers within the same credit score ranges.  In fact, the disparities were especially pronounced for borrowers with higher credit scores.  For example, among borrowers with a FICO score of over 660 (indicating good credit), African-Americans and Latinos received a high interest rate loan more than three times as often as white borrowers.[28]  Disparities in the incidence of these features are evident across all segments of the credit spectrum.

---

[26] Center for Responsible Lending Issue Brief, *Mortgage Lending Continues Under Dodd-Frank*, at 5 (Sept. 22, 2015), *available at* http://www.responsiblelending.org/mortgage-lending/policy-legislation/2014hmda_data_issuebrief_f.pdf.

[27] Federal Reserve Bulletin, *The Mortgage Market in 2011: Highlights from the Data Reported under the Home Mortgage Disclosure Act* (Dec. 2012), *available at* http://www.federalreserve.gov/pubs/bulletin/2012/PDF/2011_HMDA.pdf.

[28] Center for Responsible Lending, *Lost Ground, 2011*, *supra* note 25.

E.   **Wells Fargo's Discriminatory Lending Practices Cause Foreclosures.**

1)   **Data show that Wells Fargo's foreclosures are disproportionately located in minority neighborhoods in Philadelphia.**

81.   Wells Fargo's failure to underwrite mortgage loans in minority and underserved communities in a responsible manner has been the subject of public attention and concern for years.  For example, its practices are the focus of a 2004 report from the Center for Responsible Lending.  The report concluded that Wells Fargo's customers "too often face the loss of their home or financial ruin as a result" of its "discriminatory practices."[29]  The discriminatory practices identified in the report include charging excessively high interest rates that are not justified by borrowers' creditworthiness; requiring large prepayment penalties while deliberately misleading borrowers about the penalties; convincing borrowers to refinance mortgages into new loans that only benefit Wells Fargo; deceiving borrowers into believing that they are getting fixed-rate loans when they are really getting adjustable rate loans; charging excessive fees; and more.

82.   Such reports underscore the direct connection between foreclosures affecting minority communities and Wells Fargo's discriminatory lending practices, and their attendant harm.

83.   Far from being a responsible provider of much-needed credit in minority communities, Wells Fargo's discriminatory lending practices are a leading cause of stagnation and decline in African-American and Latino neighborhoods where its foreclosures are concentrated.  Specifically, since at least 2000, its foreclosures have been concentrated in neighborhoods with African-American or Latino populations exceeding 75%.

---

[29] Center for Responsible Lending, *A Review of Wells Fargo's Subprime Lending*, at 10 (Apr. 2004), *available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/ip004-Wells_Fargo-0404.pdf.

84.     Although 19.9% of Wells Fargo's loan originations in Philadelphia from 2004 to 2014 were in census tracts that are at least 80% African-American or Latino, 38.6% of loan originations that had entered foreclosure by May 2016 were in those census tracts.  Similarly, while 34.2% of Wells Fargo's loan originations in Philadelphia from 2004 to 2014 occurred in census tracts that are at least 50% African-American or Latino, 62.3% of Wells Fargo's loan originations that had entered foreclosure by May 2016 were in those census tracts.  Moreover, while 48.3% of Wells Fargo's loan originations in Philadelphia from 2004 to 2014 occurred in census tracts that were less than 20% African-American or Latino, only 22.1% of Wells Fargo's loan originations that had entered foreclosure by May 2016 were in those census tracts.  This data demonstrates a pattern of statistically significant differences between foreclosures in African-American and Latino neighborhoods as compared with majority-white neighborhoods.  Upon information and belief, a similar pattern of foreclosures will be evident with more recent unfavorable loans.

85.     In addition to the disproportionate distribution of Wells Fargo foreclosures in African-American and Latino neighborhoods, disparate rates of foreclosure based on race further demonstrate Wells Fargo's failure to follow responsible, non-discriminatory underwriting practices in minority neighborhoods.  While 10.9% of Wells Fargo's loans in predominantly (greater than 80%) African-American or Latino neighborhoods result in foreclosure, the same is true for only 2.5% of its loans in predominantly non-minority (at least 80% white) neighborhoods.  In other words, a Wells Fargo loan in a predominantly African-American or Latino neighborhood is 4.710 times more likely to result in foreclosure as a Wells Fargo loan in a non-minority neighborhood.  These odds ratios demonstrate a pattern of statistically significant differences in

foreclosure practices between African-American and Latino neighborhoods as compared with white neighborhoods.

86.     In addition, as discussed herein, foreclosures affect the value of both foreclosed properties and the properties in close proximity to the foreclosed properties.  Where, as is the case in the City of Philadelphia, foreclosures are spatially concentrated to particular communities, the effects are magnified.  Indeed, when a property is foreclosed in proximity to another borrower such that the borrower's property value is reduced by the nearby foreclosure, that borrower's ability to obtain a refinancing of his/her loan is impaired.  This is because the equity ratio (*i.e.*, the ratio of the property's value to the loan principal) is decreased by the reduced property value.  Because refinancing availability and terms are directly affected by the value of the securing property, such impairment can likewise contribute to the foreclosure of that borrower's property creating a downward spiral that magnifies the effects of the discrimination.

87.     Thus, Wells Fargo's discriminatory lending practices have directly caused and continue to cause foreclosures in Philadelphia.

### 2) Data show that Wells Fargo's loans to minorities result in especially quick foreclosures in Philadelphia.

88.     A comparison of the time from origination to foreclosure of Wells Fargo's loans originated in Philadelphia from 2004 to 2014 shows a disparity with respect to the speed with which loans to African-Americans and Latinos and whites move into foreclosure.  The average time to foreclosure for African-American and Latino borrowers is 4.046 years.  By comparison, the average time to foreclosure for white borrowers is 4.264 years.  These statistically significant disparities demonstrate that Wells Fargo aggressively moved minority borrowers into foreclosure as compared with how the Bank handled foreclosures for white borrowers.

89.    This disparity in time to foreclosure is further evidence that Wells Fargo is engaged in discriminatory lending practices.  The disparity in time to foreclosure demonstrates that Wells Fargo is engaged in irresponsible underwriting in African-American and Latino communities that does not serve the best interests of borrowers.  If Wells Fargo were applying the same underwriting practices in African-American and Latino neighborhoods and white neighborhoods in Philadelphia, there would not be a significant difference in time to foreclosure.  Were Wells Fargo underwriting borrowers in both communities with equal care and attention to proper underwriting practices, borrowers in African-American and Latino communities would not find themselves in financial straits significantly sooner during the lives of their loans than borrowers in white communities.  The faster time to foreclosure in African-American and Latino neighborhoods is consistent with underwriting practices in minority communities that are less concerned with determining a borrower's ability to pay and qualifications for the loan than they are in maximizing short-term profit.

90.    The HUD/Treasury Report confirms that time to foreclosure is an important indicator of discriminatory practices: "[t]he speed with which the subprime loans in these communities have gone to foreclosure suggests that some lenders may be making mortgage loans to borrowers who did not have the ability to repay those loans at the time of origination."[30]

### 3)  Data show that the discriminatory lending practices cause the foreclosures in Philadelphia.

91.    Wells Fargo's discriminatory lending practices cause foreclosures and vacancies in minority communities in Philadelphia.

---

[30] U.S. Dep't of Housing & Urban Development and U.S. Dep't of the Treasury, *Curbing Predatory Home Mortgage Lending*, at 25 (2000) ("HUD/Treasury Report"), *available at* http://www.huduser.org/Publications/pdf/treasrpt.pdf.

92.     Issuing more expensive and riskier loans to minority borrowers than the loans for which they qualify and are issued to similarly situated white borrowers directly causes increased foreclosure rates because (1) the borrowers are required to make higher loan payments; and (2) as foreclosures begin to occur in a neighborhood, refinancing out of high-cost and high-risk loans becomes increasingly difficult due to suppressed loan-to-value ratios.  The difference between what a borrower who receives a more expensive loan must pay and the lower amount for which the borrower qualified can cause the borrower to be unable to make payments on the mortgage. In such instances, the borrower would have continued to make payments on the mortgage and remained in possession of the premises had Wells Fargo not issued a more expensive loan in violation of the Fair Housing Act.  The Bank's discriminatory lending conduct therefore causes foreclosures and vacancies. Moreover, as foreclosures depress property values, borrowers in the neighborhood who are already struggling under the weight of a high-cost and high-risk loans are increasingly unable to refinance their high-cost and high-risk loan, which feeds the borrowers toward foreclosure.

93.     Giving a loan to an applicant who does not qualify for the loan, especially a refinance or home equity loan, can also cause foreclosures and vacancies.  Some homeowners live in properties that they own subject to no mortgage.  Other homeowners live in properties with modest mortgages that they can comfortably afford to pay.  Where a lender, such as Wells Fargo, solicits such a homeowner to take out a home equity loan on their property, or alternatively, to refinance their existing loan into a larger loan without properly underwriting them to assure that they can make the monthly payments for the new, larger loan, the result is likely to be that the borrower will be unable to make payments on the mortgage.  This is particularly true where the borrower is refinanced from a fixed-rate loan into an adjustable rate loan that the lender knows

the borrower cannot afford should interest rates rise.  In some instances, the lender may refinance the borrower into a new loan that the lender knows the borrower cannot sustain given the borrower's present debt obligations and financial resources.  In such circumstances, the likely result of such practices is to cause homeowners who are otherwise occupying properties without a mortgage, or comfortably making payments on a modest existing mortgage, to be unable to make payment on a new, unaffordable loan. This, in turn, causes foreclosures and vacancies.  If these unaffordable refinance and home equity loans had not been made, the subject properties would not have become vacant.

94.     A regression analysis of loans issued by Wells Fargo in Philadelphia from 2004 to 2014 controlling for objective risk characteristics such as credit history, loan to value ratio, and the ratio of loan amount to income demonstrates that a high-cost or high-risk loan is 2.865 times more likely to result in foreclosure than a loan that is not high-cost or high-risk.

95.     The regression analysis also demonstrates that a high-cost or high-risk loan made to an African-American borrower was 4.147 times more likely to result in foreclosure as compared with a non-high-cost, non-high-risk loan made to a white borrower with similar borrower and underwriting characteristics.  A high-cost or high-risk loan made to a Latino borrower was 2.641 times more likely as a non-high-cost, non-high risk loan made to a white borrower with similar risk characteristics to result in foreclosure.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

96.     A seminal report on foreclosure activity by Mark Duda and William Apgar documents the negative impact that rising foreclosures have on low-income and low-wealth minority communities, using Chicago as a case study.  Mr. Apgar is a Senior Scholar at the Joint

Center for Housing Studies of Harvard University, and a Lecturer on Public Policy at Harvard's John F. Kennedy School of Government. He previously served as the Assistant Secretary for Housing/Federal Housing Commissioner at the U.S. Department of Housing and Urban Development, and also chaired the Federal Housing Finance Board. Mr. Apgar holds a Ph.D. in Economics from Harvard University. Mr. Duda is a Research Fellow at the Joint Center for Housing Studies. The Apgar-Duda report has continually been cited by subsequent governmental, public sector, and private sector reports due to its clarity and thoroughness with respect to the negative impact foreclosures have on lower-income and minority neighborhoods.[31]

97.     This significant report highlights the direct connection between Wells Fargo's discriminatory lending practices and foreclosures, demonstrating that such foreclosures impose significant and predictable costs on borrowers, municipal governments, and neighboring homeowners.

98.     Another report, by the Center for Responsible Lending, uses a national dataset to show that the foreclosure rate for low- and moderate-income African-Americans is approximately 1.8 times higher than it is for low- and moderate-income non-Hispanic whites. The gap is smaller for Latinos, especially among low-income households, but even among low-income Latinos the foreclosure rate is 1.2 times that of low-income whites. Racial and ethnic disparities in foreclosure rates cannot be explained by income, since disparities persist even among higher-income groups. For example: approximately 10 percent of higher-income African-American borrowers and 15 percent of higher-income Latino borrowers have lost their home to foreclosure, compared with

---

[31] *See* W. Apgar, M. Duda & R. Gorey, *The Municipal Costs of Foreclosures: A Chicago Case Study* (2005), *available at* http://neighborworks.issuelab.org/resource/municipal_cost_of_foreclosure_a_chicago_case_study.

4.6 percent of higher income non-Hispanic white borrowers.  Overall, low- and moderate-income African-Americans and middle- and higher-income Latinos have experienced the highest foreclosure rates.[32]

99.    Nearly 20 percent of loans in high-minority neighborhoods have been foreclosed upon or are seriously delinquent, with significant implications for the long-term economic viability of these communities.[33]

## V.    INJURY TO PHILADELPHIA CAUSED BY WELLS FARGO'S DISCRIMINATORY LOAN PRACTICES

100.    Philadelphia has suffered both non-economic and economic injuries as a direct result of Wells Fargo's longstanding, continuing policy and practice of intentionally steering minority borrowers in Philadelphia into mortgage loans that have higher costs and risk features than more favorable and less expensive loans issued to similarly situated white borrowers, and engaging in facially neutral business policies and practices that created an "artificial, arbitrary, and unnecessary" barrier to fair housing opportunities for minority home purchasers and owners. These practices have resulted in the disproportionately high rate of foreclosure on Wells Fargo loans to African-Americans and Latinos in minority and low-income neighborhoods in Philadelphia.  Philadelphia seeks redress for the resulting injuries to the City caused by Wells Fargo's policies and practices.  The City does not seek redress in this action for injuries resulting from foreclosures on mortgages originated by lenders other than Wells Fargo.[34]

---

[32] Center for Responsible Lending, *Lost Ground, 2011*, *supra* note 25.

[33] *Id.* at 6.

[34] For clarity, the City does seek redress in this action for injuries resulting from foreclosures on mortgages for which Wells Fargo is responsible, including residential home loans and lending operations acquired from, and/or sold by or through, AM Mortgage Network

37

101.    Wells Fargo continues to engage in the discriminatory pattern or practices described herein with similar and continuing deleterious consequences to the City.

102.    Through the use of expert evidence and analytic tools such as Hedonic regression, Philadelphia is capable of establishing that the Bank's discriminatory lending practices were a direct cause of the resulting injuries alleged herein.

### A.    Non-Economic Injuries

103.    Wells Fargo's conduct has adversely impacted the ability of minority residents to own homes in the City, thereby impairing the City's goals to assure that racial factors do not adversely affect the ability of any person to choose where to live in the City or to detract from the social and professional benefits of living in an integrated society.

104.    The Bank's discriminatory lending practices have adversely affected the City's longstanding and active interest in promoting fair housing and securing the benefits of an integrated community, which are among the purposes and missions of Philadelphia's PCHR.  The PCHR has responsibility for addressing illegal housing discrimination, including discriminatory lending practices.  The City promotes equal housing opportunity through education and training, monitoring and investigating fair housing complaints utilizing techniques to support fair housing litigation.  The Bank's discriminatory lending practices directly interfere with the City's ability to achieve these important objectives.

105.    The City also established a Residential Mortgage Foreclosure Diversion Program as part of its court system.  The Bank's discriminatory lending practices were among the reasons

---

DBA Vertice, American Mortgage, American Mortgage Network, American Mortgage Network DBA Vertice, Wachovia Mortgage, Wachovia Mortgage, FSB, World Savings Bank, and World Savings Bank, FSB.

necessitating this program and make the City's efforts more challenging and the objectives more difficult to attain.

**B.      Economic Injuries**

106.    The City has suffered economic injury based upon reduced property tax revenues resulting from (a) the decreased value of the vacant properties themselves, and (b) the decreased value of properties surrounding the vacant properties. In addition, the City has suffered economic injury resulting from the cost of municipal services that it provided and still must provide to remedy blight and unsafe and dangerous conditions, which exist at properties that were foreclosed as a result of Wells Fargo's illegal lending practices.  The City also provides housing counseling services, the need for, and cost of which has been increased significantly by these discriminatory lending practices.

> **1)  Philadelphia has been injured by a suppression of property tax revenues from foreclosures caused by Wells Fargo's discriminatory lending practices.**

107.    When a home falls into foreclosure, it suppresses the property value of the foreclosed home as well as the values of other homes in the neighborhood.  These suppressed property values in turn suppress property tax revenues to the City.

108.    As property values decrease (or fail to rise as much as they would absent Wells Fargo's discriminatory lending practices), Philadelphia loses substantial, material amounts of property tax revenues from the suppressed value of the foreclosed homes themselves and those in the surrounding neighborhood.

109.    The property value of homes in foreclosure tends to be suppressed as compared with those homes not in foreclosure (*e.g.*, 28%).[35]  The suppression of property values can be measured by economic analysis applying various objective criteria, including the well-established Federal Housing Finance Agency Home Price Index for Philadelphia.

110.    A portion of this lost home value is attributable to homes foreclosed as a result of Wells Fargo's discriminatory loan practices.

111.    The suppressed property values of foreclosed homes in turn directly reduce property tax revenues to the City and constitute damages suffered by Philadelphia.

112.    Wells Fargo foreclosure properties and the problems associated with them likewise significantly suppress surrounding property values because the neighborhoods become less desirable.  This in turn reduces the property tax revenues collected by Philadelphia.

113.    Property tax losses suffered by Philadelphia caused by vacancies resulting from Wells Fargo's foreclosures are fully capable of empirical quantification.

114.    Routinely maintained property tax and other data allow for calculation of the property tax revenues lost by the City as a direct result of particular Wells Fargo foreclosures. Using a well-established statistical regression technique that focuses on effects on neighboring properties, the City can isolate the lost property value attributable to Wells Fargo foreclosures and vacancies caused by discriminatory lending from losses attributable to other causes, such as neighborhood conditions.  This technique, known as Hedonic regression, when applied to housing markets, isolates the factors that contribute to the value of a property by studying thousands of housing transactions.  Those factors include the size of a home, the number of bedrooms and

---

[35] Campbell, John Y., Stefano Giglio & Parag Pathak, National Bureau of Economic Research, NBER Working Paper Series, *Forced Sales and House Prices* (Apr. 2009), *available at* http://www.nber.org/papers/w14866.pdf?new_window=1.

bathrooms, whether the neighborhood is safe, whether neighboring properties are well maintained, and more. Hedonic analysis determines the contribution of each of these house and neighborhood characteristics to the value of a home.

115.   The number of foreclosures in a neighborhood is one of the neighborhood traits that Hedonic analysis can examine.  Hedonic analysis allows for the calculation of the impact on a property's value of the first foreclosure in close proximity (*e.g.*, ⅛ or ¼ of a mile), the average impact of subsequent foreclosures, and the impact of the last foreclosure.

116.   Foreclosures attributable to Wells Fargo's discriminatory lending practices in minority and low-income neighborhoods in Philadelphia can be analyzed through Hedonic regression to calculate the resulting loss in the property values of nearby homes.  This loss can be distinguished from any loss attributable to non-Wells Fargo foreclosures or other causes.  The loss in property value in minority and low-income neighborhoods in Philadelphia attributable to Wells Fargo's unlawful acts and consequent foreclosures can be used to calculate the City's corresponding loss in property tax revenues.

117.   Various studies establish that Hedonic regression can be used for this purpose.  A study published by the Fannie Mae Foundation, using Chicago as an example, determined that each foreclosure is responsible for an average decline of approximately 1.1% in the value of each single-family home within an eighth of a mile.[36]

118.   Other studies have focused on the impact of abandoned homes on surrounding property values.  A study in Philadelphia, for example, found that each home within 150 feet of

---

[36] *See* Dan Immergluck & Geoff Smith, *The External Costs of Foreclosure: The Impact of Single-Family Mortgage Foreclosures on Property Values*, 17 Housing Policy Debate 57, 69 (2006).

an abandoned home declined in value by an average of $7,627; homes within 150 to 299 feet declined in value by $6,810; and homes within 300 to 449 feet declined in value by $3,542.[37]

119.    These studies highlight the direct connection between reduced tax revenues to the City as the result of foreclosures and Wells Fargo's discriminatory lending practices.

120.    And most recently, a Los Angeles study reported, "[i]t is conservatively estimated that each foreclosed property will cause the value of neighboring homes within an eighth of a mile to drop 0.9%." Thus, "[i]n Los Angeles impacted homeowners could experience property devaluation of $53 billion."[38]  This decreased property value of neighboring homes in turn reduces property tax revenues to the City.

121.    Application of such Hedonic regression methodology to data regularly maintained by Philadelphia can be used to quantify the property tax injury to the City directly caused by Wells Fargo's discriminatory lending practices and resulting foreclosures in minority neighborhoods.

> **2)  Philadelphia is injured because it provided and still must provide costly municipal services for foreclosure properties in minority neighborhoods as a direct result of Wells Fargo's discriminatory lending practices.**

122.    Wells Fargo foreclosured properties directly cause costs to the City because the City is required to provide increased municipal services at these properties.  Even prior to completion of the foreclosure process, data show that 20% of homes undergoing foreclosure are

---

[37] *See* Anne B. Shlay & Gordon Whitman, *Research for Democracy: Linking Community Organizing and Research to Leverage Blight Policy*, at 21 (2004).

[38] The Alliance of Californians for Community Empowerment and the California Reinvestment Coalition, *The Wall Street Wrecking Ball: What Foreclosures are Costing Los Angeles Neighborhoods*, at 3 (2011) ("Cost to Los Angeles Report").

vacated.[39]  These services would not have been necessary if the properties had not been foreclosed upon.   Moreover, these foreclosures resulting from Wells Fargo's unlawful conduct have contributed to the necessity for the City to divert essential municipal services that would have been utilized for other purposes to promote the health, welfare, and safety of its residents.

123.    Wells Fargo's discriminatory lending and the subsequent foreclosures have put a strain on the resources of the City's Police Department and negatively impacted the ability to police a wide assortment of communities within the City of Philadelphia over the last several years.

124.    For example, abandoned foreclosed properties required the Police Department to dedicate extraordinary amounts of man-hours to respond to issues which required it to deploy, in numbers and frequency otherwise unusual, uniformed officers and plain-clothed detectives, and to seek the assistance of Licenses and Inspections Officers and other resources from other Departments within the City of Philadelphia.  This response was caused in part by the increased level of crime plaguing the neighborhoods as a result of foreclosed and abandoned homes.  The crimes generating these additional resource requirements include burglaries to the properties and the surrounding homes, drug sales, vagrancy, home squatters, and an increased level of prostitution and lewd conduct.

125.    Additionally, abandoned homes were magnets for individuals who repeatedly burglarized unoccupied and abandoned homes to rip copper tubing and wiring from the interior of the homes.  This often left water spewing out of the homes, causing thousands of dollars' worth of damage to the homes.  This occurrence had a negative impact on the property value of not just

---

[39] *See* RealtyTrac, *Owner-Vacated Properties Represent 20 Percent of All Foreclosures Nationwide* (June 2013), *available at* http://www.realtytrac.com/content/foreclosure-market-report/owner-vacated-foreclosure-update-7771.

that home, but the remaining residences of the neighborhoods, all the while creating an increased fear of crime and victimization among residents.  Though many of these problem areas were identified by beat officers on regular patrol, many of the abandoned properties prompted individual homeowners, homeowners' associations, and neighborhood watch groups to contact the Philadelphia Police Department.  These complaints came in the form of emails, phone calls, and personal complaints that were directly received by the Police Department, as well as through other City Departments, such as Licenses and Inspections, Public Works, the Managing Director's office, as well as City Council members' and the Mayor's offices.

126.    These complaints required officers to consistently check on these properties and required a disproportionate amount of resources to manage the problem.

127.    Likewise, the Philadelphia Fire Department has sent, and will continue to send personnel and resources to Wells Fargo foreclosure properties to respond to a variety of fire-related problems that arise at these properties because of their foreclosure status and neglect.

128.    The Philadelphia Department of Licenses and Inspections has devoted, and will continue to devote extraordinary personnel time and out-of-pocket funds to perform a number of tasks that arise at these properties because of their foreclosure status.  These include, but are not limited to the following: (a) inspect and issue permitting violations in contravention of the Philadelphia Code, and (b) condemn and demolish vacant structures deemed an imminent hazard to public safety.

129.    The City has been required to frequently perform certain services for these properties or to hire contractors to do so, including, but not limited to, (i) removing excess vegetation at vacant properties, (ii) hauling away trash and debris at vacant properties, (iii)

boarding vacant property from casual entry, (iv) putting up fencing to secure vacant properties, and (v) painting and removing graffiti at vacant properties.

130.    The City of Philadelphia's Law Department has devoted, and will continue to devote personnel time and out-of-pocket resources to perform a number of tasks that arise at these properties because of their foreclosure status.  These include, but are not limited to the following: (a) prosecuting code enforcement cases; (b) preserving the City's lien rights at judicial foreclosure proceedings; and (c) pursuing court ordered injunctions involving a myriad of potential problems at foreclosure properties.

131.    As stated by the *Cost to Los Angeles* Report, "[l]ocal government agencies have to spend money and staff time on blighted foreclosed properties, providing maintenance, inspections, trash removal, increased public safety calls, and other code enforcement services . . . . Responding to these needs is a gargantuan task that involves multiple agencies and multiple levels of local government."[40]

132.    Moreover, as discussed above, the Apgar-Duda report underscores the direct connection between municipal costs stemming from foreclosures and Wells Fargo's discriminatory lending practices.

## VI.    SAMPLE PROPERTIES IN THE CITY OF PHILADELPHIA

### A.    Foreclosures

133.    Plaintiff has preliminarily identified one thousand sixty-seven (1,067) high-cost or high-risk loans issued to minority borrowers by Wells Fargo in Philadelphia between 2004 and

---

[40] *Cost to Los Angeles Report*, *supra* note 38.

2014 that resulted in foreclosure.[41]   These loans are deemed to violate the FHA and are discriminatory because they were issued to minority borrowers and were more expensive than loans issued to similarly situated white borrowers.   Such discriminatory loans issued by Wells Fargo are continuing to enter the foreclosure process.   The City has already incurred or will incur in the future, damages corresponding to each of these properties. A sample of property addresses corresponding to these foreclosures is set forth below:

>2834 B Street, 19134[42]
>
>865 N. 47th Street, 19139[43]
>
>57 N. 53rd Street, 19139[44]
>
>1212 N. Wilton Street, 19131[45]

---

[41] Plaintiff anticipates that it will be able to identify more foreclosures resulting from the issuance of discriminatory loans during this time period with the benefit of discovery.   This conclusion derives from the fact that because of certain reporting limitations, the publicly available mortgage loan databases utilized by Plaintiff are not as comprehensive as the mortgage loan databases maintained by and in the possession of an issuing bank.  For these reasons, Plaintiff will also be able to provide additional specific property addresses corresponding to foreclosures with the benefit of discovery.

[42] This borrower is Hispanic and received a government loan.   Plaintiff has the name for this borrower but has omitted it for privacy reasons.  In the event this Court requires inclusion of the borrower names Plaintiff will file a complaint under seal with this information.

[43] This borrower is African-American and received a government loan.   Plaintiff has the name for this borrower but has omitted it for privacy reasons.  In the event this Court requires inclusion of the borrower names Plaintiff will file a complaint under seal with this information.

[44] This borrower is African-American and received a government loan.   Plaintiff has the name for this borrower but has omitted it for privacy reasons.  In the event this Court requires inclusion of the borrower names Plaintiff will file a complaint under seal with this information.

[45] This borrower is African-American and received a conventional loan.   Plaintiff has the name for this borrower but has omitted it for privacy reasons.  In the event this Court requires inclusion of the borrower names Plaintiff will file a complaint under seal with this information.

256 W. Zeralda Street, 19144[46]

**B.      Discriminatory Loans Issued Subsequent to September 23, 2014[47]**

134.      Wells Fargo has continued to issue high-cost or high-risk loans to minority borrowers in Philadelphia subsequent to September 23, 2014.  These loans violate the FHA and are discriminatory because they were issued to minority borrowers and were more expensive than the loans issued to similarly situated white borrowers during the limitations period.  Upon information and belief, as well as historic experience, a significant number of the properties corresponding to issuance of discriminatory loans subsequent to September 23, 2014 will result in foreclosures or other adverse events that will cost the City a loss of tax revenues and significant remediation costs.  A sample of property addresses corresponding to the issuance of these loans to minority borrowers all of which closed (*i.e.* "originated") during the limitations period is set forth below.

229 W. Hansbery St., 19144[48]

1148 Marilyn Road, 19151[49]

---

[46] This borrower is African-American and received a conventional loan.  Plaintiff has the name for this borrower but has omitted it for privacy reasons.  In the event this Court requires inclusion of the borrower names Plaintiff will file a complaint under seal with this information.

[47] Loans issued subsequent to September 23, 2014 are appropriately included within the time period of this case due to continuing violations and/or tolling by law and/or agreement.

[48] This borrower is Hispanic and received a conventional loan with a loan origination date of December 23, 2014.  Plaintiff has the name for this borrower but has omitted it for privacy reasons.  In the event this Court requires inclusion of the borrower names Plaintiff will file a complaint under seal with this information.

[49] This borrower is African-American and received a government loan with a loan origination date of December 5, 2014.  Plaintiff has the name for this borrower but has omitted it for privacy reasons.  In the event this Court requires inclusion of the borrower names Plaintiff will file a complaint under seal with this information.

1644 N. Robinson St., 19151[50]

1334 N. 59th St., 19151[51]

429 E. Louden St., 19120[52]

6238 Everett St., 19149[53]

135.    An examination of publicly available information on loans issued during the limitations period strongly supports the conclusion that a greater number of high-cost or high-risk loans were issued to minority borrowers than to non-minority borrowers during the two years preceding the filing of this Complaint.   The data available to the City prior to discovery demonstrate significant differences in the treatment of those categories.   However, the small size of the available sample does not lend itself adequately to statistical analysis in isolation.   Upon information and belief, the disparity exemplified by the examination of the earlier loans persists. In addition, the City maintains that there is a continuing violation of the same lending practices, and therefore that the statute of limitations is running and/or was tolled by Wells Fargo's conduct

---

[50] This borrower is African-American and received a government loan with a loan origination date of October 22, 2014.  Plaintiff has the name for this borrower but has omitted it for privacy reasons.  In the event this Court requires inclusion of the borrower names Plaintiff will file a complaint under seal with this information.

[51] This borrower is African-American and received a government loan with a loan origination date of October 9, 2014.  Plaintiff has the name for this borrower but has omitted it for privacy reasons.  In the event this Court requires inclusion of the borrower names Plaintiff will file a complaint under seal with this information.

[52] This borrower is African-American and received a conventional loan with a loan origination date of September 29, 2014.  Plaintiff has the name for this borrower but has omitted it for privacy reasons.  In the event this Court requires inclusion of the borrower names Plaintiff will file a complaint under seal with this information.

[53] This borrower is African-American and received a government loan with a loan origination date of September 24, 2014.  Plaintiff has the name for this borrower but has omitted it for privacy reasons.  In the event this Court requires inclusion of the borrower names Plaintiff will file a complaint under seal with this information.

or agreement.  There is thus a single claim, requiring but a single evaluation of the overall disparate impact.

## VII.   CLAIM FOR RELIEF

### Violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*

136.   Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

137.   Wells Fargo's acts, policies, and practices as described constitute intentional discrimination on the basis of race. Wells Fargo has intentionally targeted minority borrowers, including the residents of low-income and predominantly African-American and Latino neighborhoods in Philadelphia, for different treatment than non-minority borrowers in Philadelphia with respect to mortgage lending.  Wells Fargo has intentionally targeted minority borrowers in these low-income and/or minority neighborhoods for high-cost loans without regard to their credit qualifications and without regard to whether they qualify for more advantageous loans, including prime loans.  Wells Fargo has intentionally targeted these minority borrowers for increased interest rates, points, and fees, and for other disadvantageous loan terms including, but not limited to, adjustable rates, prepayment penalties, and balloon payments.  Wells Fargo has intentionally targeted these minority borrowers for unfair and deceptive lending practices in connection with marketing and underwriting mortgage loans.

138.   Wells Fargo's acts, policies, and practices have had an adverse and disproportionate impact on African-American and Latino borrowers in low-income and predominantly African-American and Latino neighborhoods in Philadelphia as compared to similarly situated white borrowers.  This adverse and disproportionate impact is the direct result of numerous factors, including, but not limited to: knowing about lending practices that either

risked or resulted in failing to adequately monitor the Bank's practices regarding mortgage originations, purchasing, marketing, sales, and risk management functions; failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history; placing borrowers in more expensive, riskier loans than they qualified for; failing to properly underwrite refinance and hybrid adjustable-rate loans; allowing mortgage brokers to charge "yield spread premiums" for qualifying a borrower for an interest rate that is higher than the rate the borrower qualifies for and can actually afford; marketing certain more expensive or riskier loan products to residents in predominantly minority neighborhoods; requiring substantial prepayment penalties that prevent borrowers whose credit has improved from refinancing their discriminatory loan to a prime loan; charging excessive points and fees that are not associated with any increased benefits for the borrower; creating a compensation scheme incentivizing employees to issue discriminatory loans; and failing to monitor and ensure compliance with federal fair lending laws.

139. These practices, which are united because they represent manifestations of the same continuous and unbroken practice of engaging in facially neutral business policies and practices that created an "artificial, arbitrary, and unnecessary" barrier to fair housing opportunities for minority home purchasers and owners, have caused African-American and Latino borrowers in low-income and predominantly African-American and Latino neighborhoods in Philadelphia to receive mortgage loans from Wells Fargo that have materially less favorable terms than mortgage loans given by Wells Fargo to similarly situated white borrowers, and that are materially more likely to result in foreclosure.

140. Wells Fargo's residential lending-related acts, policies, and practices violate the Fair Housing Act as:

(a)     Discrimination on the basis of race and national origin in making available, or in the terms and conditions of, residential real estate-related transactions, in violation of 42 U.S.C. § 3605(a); and

(b)     Discrimination on the basis of race and national origin in the terms, conditions, or privileges of sale of a dwelling, in violation of 42 U.S.C. § 3604(b).

141.    Wells Fargo's policies or practices are not justified by business necessity or legitimate business interests.

142.    Wells Fargo's policies and practices are continuing.

143.    Wells Fargo is and has been under a continuing duty to disclose to the City the true character, quality, and nature of its policies, practices and conduct alleged herein.  Because of its knowing, affirmative, and/or active concealment of this information, Wells Fargo is estopped from relying on any statutes of limitation in its defense of this action.

144.    The City is an aggrieved person as defined by 42 U.S.C. § 3602(i) and has suffered damages as a result of Wells Fargo's conduct.

145.    The City's damages include lost tax revenues and the expenses of providing increased and/or extraordinary municipal services. The loss of tax revenues at specific foreclosure sites and at closely neighboring properties in neighborhoods affected by Wells Fargo's discriminatory policies and practices was directly connected and fairly traceable to Wells Fargo's discriminatory lending.  Likewise, the need to provide increased and/or extraordinary municipal services at blighted foreclosure sites in predominantly minority neighborhoods of the City was directly connected and fairly traceable to Wells Fargo's discriminatory lending.

146.    Wells Fargo's policies and practices, as described herein, had the effect and/or purpose of discriminating on the basis of race or national origin.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), the City demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the City respectfully prays that the Court grant it the following relief:

A.       Enter a declaratory judgment that the foregoing acts, policies, and practices of Wells Fargo violate 42 U.S.C. §§ 3604 and 3605;

B.       Enter a permanent injunction enjoining Wells Fargo and its directors, officers, agents, and employees from continuing the discriminatory conduct described herein, and directing Wells Fargo and its directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the discriminatory conduct described herein, and to prevent additional instances of such conduct or similar conduct from occurring in the future, pursuant to 42 U.S.C. § 3613(c)(1);

C.       Award compensatory damages to the City in an amount to be determined that would fully compensate the City of Philadelphia for its injuries caused by the conduct of Wells Fargo alleged herein, pursuant to 42 U.S.C. § 3613(c)(1);

D.       Award punitive damages to the City in an amount to be determined that would punish Wells Fargo for the willful, wanton, and reckless conduct alleged herein, and that would effectively deter similar conduct in the future, pursuant to 42 U.S.C. § 3613(c)(1);

E.       Award the City its reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 3613(c)(2);

F.       Require payment of pre-judgment interest on monetary damages; and

G.       Order such other relief as this Court deems just and equitable.

Date: May 15, 2017                    Respectfully submitted,

*Sherrie R. Savett*

Sherrie R. Savett (PA ID 17646)
*ssavett@bm.net*
Sarah Schalman-Bergen (PA ID 206211)
*sschalman-bergen@bm.net*
Patrick F. Madden (PA ID 309991)
*pmadden@bm.net*
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000

Rachel Geman (*pro hac vice pending*)
*rgeman@lchb.com*
Daniel E. Seltz (*pro hac vice pending*)
*dseltz@lchb.com*
Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street
8th Floor
New York, NY 10013
212-355-9500

Robert Peck (*pro hac vice pending*)
*robert.peck@cclfirm.com*
CENTER FOR CONSTITUTIONAL
LITIGATION, P.C.
7916 Bressingham Drive
Fairfax Station, Virginia 22039
Telephone: (202) 944-2803

Erwin Chemerinsky (*pro hac vice pending*)
*echemerinsky@law.uci.edu*
UNIVERSITY OF CALIFORNIA, IRVINE
401 East Peltason Drive, Educ. 1095
Irvine, CA 92697
Telephone: (949) 824-7722

Joel Liberson (*pro hac vice pending*)
*joel@taresources.com*
TRIAL & APPELLATE RESOURCES, P.C.
3655 Torrance Blvd., 3rd Floor
Torrance, CA 90503
Telephone: (917) 848-3218

53

Sozi Pedro Tulante, City Solicitor
Marcel S. Pratt, Chair, Litigation Group
Eleanor N. Ewing, Chief Deputy Solicitor
Benjamin H. Field, Deputy City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 17th Floor
Philadelphia, PA 19102
(215) 683-5000
*sozi.tulante@phila.gov*
*marcel.pratt@phila.gov*
*eleanor.ewing@phila.gov*
*benjamin.field@phila.gov*

*Attorneys for Plaintiff*